UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

RHONDA LEDFORD, an individual;
RAYMON GREGSTON, an individual; JO
MCKINNEY, an individual; SHANE
PENROD, an individual; KIM
MCCORMICK, an individual; BOB
ROBINSON, an individual; and GRACIE
REYNA, an individual; LISA
LITTLEFIELD, an individual; ADDISON
FORDHAM, an individual; TOM DE
KNIF, an individual, FRANK
FARNWORTH, an individual,

Plaintiffs,

v.

IDAHO DEPARTMENT OF JUVENILE
CORRECTIONS, an executive department
of the State of Idaho; IDJC DIRECTOR
SHARON HARRIGFELD, in her
individual and official capacities; IDJC
JUVENILE CORRECTIONS CENTER-
NAMPA SUPERINTENDENT BETTY
GRIMM, in her individual and official
capacities; and DOES 1-20,

Defendants.

Case No. 1:12-cv-00326-BLW

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

The Court has before it a motion for summary judgment filed by the defendants.

The Court heard oral argument on the motion on March 5, 2014, and the motion is now at

issue.  For the reasons, described below, the Court will grant the motion in part,

dismissing Counts Four, Five, Six, and Seven.  In addition, pursuant to the Eleventh

Amendment, the Court will dismiss all monetary damage claims against the state agency

defendant and the individual defendants sued in their official capacity.  The Court will also dismiss the claim for monetary damages against the agency defendant and individual defendants – whether sued in their official capacity or individual capacity – contained in Count Two for violation of the Idaho Constitution.  The remaining claims are (1) monetary damage claims under Count One (First Amendment claim) and Count Three (Idaho Whistleblower Act) against the individual defendants in their individual capacity, and (2) claims for declaratory and prospective injunctive relief under Counts One through Three against all defendants.

## LITIGATION BACKGROUND

This is a whistleblower case.  The ten plaintiffs – employees at the Nampa facility operated by the Idaho Department of Juvenile Corrections – claim they suffered retaliation when they protested unsafe conditions at the facility.  They claim that the retaliation was designed to suppress their protected speech and prevent the public from finding out about deplorable conditions at the facility that placed juvenile inmates in danger.

Plaintiffs have sued (1) the agency (the Idaho Department of Juvenile Corrections); (2) the agency Director (Sharon Harrigfeld); and (3) the Superintendent of the Nampa facility (Betty Grimm).  Their complaint contains seven causes of action:  (1) In Count One, all plaintiffs claim their First Amendment rights were violated; (2) In Count Two, all plaintiffs claim their rights under the Idaho Constitution were violated; (3) In Count Three, all plaintiffs claim their rights under the Idaho Whistleblower Act were violated; (4) In Count Four, all plaintiffs claim that the defendants intentionally

inflicted upon them emotional distress; (5) In Count Five, plaintiff Ledford alleges violations of the Family Medical Leave Act and the Americans with Disabilities Act; (6) In Count Six, plaintiff McKinney alleges violations of the Age Discrimination in Employment Act; (7) In Count Seven, plaintiff Penrod alleges violations of the Uniformed Services Employment and Reemployment Rights Act.

Defendants have moved for summary judgment on all seven claims. The Court will address each below, after resolving defendants' general claims regarding the Idaho Tort Claims Act and the Eleventh Amendment.

## ANALYSIS

### Idaho Tort Claims Act

Defendants argue that plaintiffs' failure to comply with the Idaho Tort Claims Act (ITCA) warrants dismissal of their state tort law claim contained in Count Four for intentional infliction of emotional distress. The ITCA requires, as a condition precedent to filing suit against the State and its officials, that a notice of tort claim be filed complying with Idaho Code §§ 6-905, 6-906. *Smith v. City of Preston,* 586 P.2d 1062, 1065 (Id.Sup.Ct 1978). Plaintiffs did send letters on behalf of some of the plaintiffs describing their claims, and argue that this constitutes substantial compliance with the ITCA. It is undisputed, however, that the earliest of the several letters sent by plaintiffs was dated June 27, 2012, two days before this lawsuit was filed. *See Exhibit KK (Dkt. No. 55-32).* Even assuming, *arguendo,* that the contents of these letters complies with the content required by the ITCA, the plaintiffs filed suit before providing the defendants with the required notice. The Idaho Supreme Court has held that the ITCA notice is a

required condition precedent to filing suit. *Smith,* 586 P.2d at 1065. Because the plaintiffs failed to satisfy that condition precedent, their state tort law claim in Count Four for intentional infliction of emotional distress must be dismissed.

This analysis does not affect Count Three, the claim under the Idaho Whistleblower Act. Notice under the ITCA is not required as a condition precedent to suit under the Idaho Whistleblower Act. *See Van v. Portneuf Medical Center,* 212 P.3d 982 987 (Id.Sup.Ct. 2009). The dismissal here is limited to Count Four.

## Eleventh Amendment

Defendants argue that all compensatory damage claims against the defendants, except those against the individuals in their individual capacity, are barred by the Eleventh Amendment. The plaintiffs respond that the defendants have waived this defense by waiting too long to raise it.

Under the Eleventh Amendment, "agencies of the state are immune from private damage actions or suits for injunctive relief brought in federal court." *Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir.1999). An exception under *Ex Parte Young,* 209 U.S. 123 (1908), however, allows citizens to sue state officers in their official capacities "for prospective declaratory or injunctive relief . . . for their alleged violations of federal law." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir.2012).

The immunity under the Eleventh Amendment may be waived. *Hill v. Blind Indus. and Servs.*, 179 F.3d 754, 756 (9th Cir.1999). A waiver occurs "when the state's conduct during the litigation clearly manifests acceptance of the federal court's

jurisdiction or is otherwise incompatible with an assertion of Eleventh Amendment immunity." *Id.* at 759.  For example, when a state chose to defend on the merits and did not invoke its Eleventh Amendment immunity until the opening day of trial, the Circuit held that the state had waived its immunity.  *Id.*  In finding waiver, the Circuit reasoned that the state "hedged its bet on the trial's outcome" and that "[s]uch conduct undermines the integrity of the judicial system . . . wastes judicial resources, burdens jurors and witnesses, and imposes substantial costs upon the litigants." *Id*. at 756.

In another case, the Circuit found waiver where the state did not invoke immunity in its summary judgment brief, but raised it later after "listening to [the] court's substantive comments on the merits of [the] case . . . ." *In re Bliemeister,* 296 F.3d 858, 862 (9th Cir. 2002).  The Circuit found waiver because the state's delay in asserting immunity "was clearly a tactical decision." *Id*.

In the present case, there is no evidence that defendants made a tactical decision to delay invoking immunity as the state did in *Bliemeister,* or hedged their bets in a manner that undermined the integrity of the proceedings as the state did in *Hill.*  Plaintiffs cite no authority finding waiver where the defendants invoked immunity in their summary judgment motion, as they did here.  For all these reasons, the Court rejects plaintiffs' argument that the Eleventh Amendment immunity has been waived.

Because the Eleventh Amendment applies, the Court will dismiss all monetary damages claims against the state agency defendant and the individual defendants sued in their official capacity.  Claims against the individual defendants in their individual capacity are not affected.  *See Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir.1992).  All

**Memorandum Decision & Order – page 5**

that remains are (1) monetary damage claims against the individual defendants in their individual capacity, and (2) claims for declaratory and prospective injunctive relief against all defendants.[1]

## First Amendment Claim

In Count One of their Second Amended Complaint, plaintiffs allege a cause of action for violation of their First Amendment rights.  This claim – brought against state actors – should have been brought under 42 U.S.C. § 1983 but plaintiffs fail to cite that statute in their Second Amended Complaint.  Defendants ask the Court to dismiss the claim for that failure.  Plaintiffs respond that they will amend their complaint to correct the error, but defendants argue that it is too late in the game.

To state a claim under § 1983, a complaint "must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir.2006).  The plaintiffs' Second Amended Complaint contains detailed allegations covering both of these requirements even though it fails to cite § 1983.  Plaintiffs allege in some detail that the defendants deprived them of their First Amendment rights, s*ee Second Amended Complaint (Dkt. No. 24)* at p. 21-23, and committed those acts "under color of law."  *Id.* at ¶ 86.  Given this, the failure to cite § 1983 is not fatal.

---

[1] Defendants point out that defendant Grimm has retired and plaintiff Ledford has recently been fired.  These changes in the status of the parties can be addressed at a later point in the proceedings.

The defendants also challenge the sufficiency of plaintiffs' evidence on their First Amendment claim.  The Court finds it sufficient to withstand scrutiny at this summary judgment stage, where the Court does not judge credibility and must grant all inferences in favor of the plaintiffs.  The Court will explain its reasoning below.

Plaintiffs' First Amendment claim is based on the principle that "a state may not abuse its position as employer to stifle the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest." *Dahlia v. Rodriguez,* 735 F.3d 1060, 1066 (9th Cir. 2013).  Moreover, the public has a strong interest in hearing from public employees, especially because "[g]overnment employees are often in the best position to know what ails the agencies for which they work."  *Id.* The law seeks "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  In the classic whistleblower case "the state has no legitimate interest in covering up corruption and physical abuse." *Dahlia,* 735 F.3d at 1067.  "As an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation." *Id.*

The Circuit has refined the Supreme Court's balancing test into a five-step inquiry, asking:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or

motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Dahlia,* 735 F.3d at 1067.  Turning to the first question, plaintiffs allege that defendants retaliated against them for speaking out about corruption, waste, and the danger to juvenile inmates at the Juvenile Correction Center in Nampa.  There are at least questions of fact over whether these subjects are matters of public concern.

With regard to the second question, the Circuit has held that "the scope and content of a plaintiff's job responsibilities can and should be found by a trier of fact," guided by "ordinary principles of logic and common sense."  *Posey v. Lake Pend Oreille School Dist. No. 84,* 546 F.3d 1121, 1129 (9th Cir. 2008).  In making this factual determination, the trier of fact is guided by this principle:  "[I]f a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee."  *Id.* at 1075.  Moreover, if an employee raises complaints outside the chain of command, it is more likely that the employee is not speaking merely as a public employee but as a private citizen.  *See Freitag v. Ayers,* 468 F.3d 528, 545-46 (9th Cir.2006) (holding that the correctional officer's communications with a state senator and the inspector general were protected speech, but her internal reports were not).

Here, plaintiff Ledford did not just follow the internal chain of command in making her complaints about danger to juveniles, but also contacted the Governor's

office, *see Ledford Deposition (Dkt. No. 55-1)* at p. 79, and spoke to a State Senator. *See Separate Statement (Dkt. No. 53-1)* at p. 8.  All the plaintiffs allege that they were protesting the dangers to juveniles and systemic waste and corruption at the facility.  This is enough to at least create issues of fact on this intensely factual issue. *Freitag*, 468 F.3d at 546 (holding that determining the scope of professional duties requires "factual determinations").

Turning to the third question, defendants argue that plaintiffs have failed to come forward with any facts that they suffered adverse employment actions as a result of their speech.  The Court disagrees.

To constitute an adverse employment action, "a government act of retaliation need not be severe and it need not be of a certain kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden." *Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th Cir. 2003).  After reviewing the case law, the Circuit in *Coszalter* held that "[o]ur findings in these cases were not dependent on any characterization of the government action as a denial of a valuable governmental benefit or privilege. [T]he relevant inquiry is whether the state had taken action designed to retaliate against and chill political expression. *Id.* (internal quotations and citations omitted).  Indeed, a "campaign[ ] of harassment and humiliation" could be deemed an adverse employment action even without the loss of any governmental benefit. *Id.*

The defendants focus on the lack of any loss of benefits.  They point to evidence that plaintiffs all remain employed by the Nampa facility, have received merit pay raises,

and have not been subjected to any disciplinary action that affected their job duties or compensation.

But the plaintiffs have come forward with evidence that at least creates issues of fact on whether they were harassed and threatened by defendants Grimm and Harrigfeld in an effort to suppress their speech, *i.e.,* their protests of safety and security risks.  Under *Coszalter,* that is sufficient to constitute an adverse employment action.  The Court will discuss some of this evidence below.

Plaintiff Ledford alleges that following her protests about dangers to juveniles to Grimm, she was issued a list of "expectations" that were unique to her and prohibited her from voicing her opinions.  *See Separate Statement, supra* at p. 9; *Ledford Deposition,* at p. 51.  The list of "expectations" was prepared by Grimm.  *See Freckleton Deposition (Dkt. No. 55-1)* at 72-73.  Grimm had been gathering information on Ledford.  *See Separate Statement, supra,* at p. 8.  Ledford also alleges that she was treated in a hostile manner that caused her great stress and led to her seeking leave from work.  *See Ledford Deposition, supra,* at p. 83.  As a result, she went three months without a paycheck.  *Id.*

Plaintiff Gracie Reyna testified to the same thing, stating that she often had to take sick leave because she was so stressed from the hostility she faced for speaking out about juvenile safety and workplace abuses.  *See Reyna Deposition (Dkt. No. 55-1)* at pp. 119-121.  The stress causes her to "cough a lot" and she has lost a "lot of weight" because she "really can't eat.  I'm still vomiting food out."  *Id.* at p.121.

Plaintiff Fordham was critical of Grimm and Harrigfeld and protested that their policies and practices compromised the safety and security of staff and the juveniles.  *See*

*Fordham Deposition (Dkt. No. 55-1)* at p. 119, 121-22.  He relayed his criticisms to his supervisor and intended them to be passed onto Grimm and Harrigfeld, and saw evidence that both of them knew of his complaints.  *Id.* at p. 120.  For example, when he complained that putting Laura Roters in charge of the Observation and Assessment Unit would compromise the safety of staff and juveniles, Grimm threatened to fire him if he did not support Roters.  *Id.* at 113.

Plaintiff Gregston complained directly to Grimm and Harrigfeld about improper hiring and promotions and other practices that were causing increased risks to the safety and security of staff and juveniles.  He was the co-author of a petition making these complaints, and Grimm and Harrigfeld questioned him about the petition.  *See Gregston Deposition (Dkt. No. 55-1)* at pp. 57-60.  Grimm identified Gregston as "one of the foxes in my henhouse."  *See Separate Statement, supra,* at p. 14.  Gregston was threatened with disciplinary action if he continued in his criticisms of Grimm and Harrigfeld.  *See Gregston Deposition, supra,* at pp. 120, 135-36.

Plaintiff Penrod discussed his criticisms of safety risks directly with Grimm and others.  *See Penrod Deposition (Dkt. No.  55-1)* at p. 127-28, 131-33.  Penrod was the first person to sign the protest petition (referred to above) drafted by plaintiff Gregston.  Within two weeks of signing the petition, he was placed on the graveyard shift and was told that it was for "disciplinary" reasons.  *Id.* at 201.  This reason was, according to Penrod, "unfair" and a "fake thing."  *Id.* at 202-03.  He found the shift change very difficult.  *Id.* at p. 201.  He was later told the shift change was part of a mandatory six-month cross-training program, but the superintendent of the facility had never heard of

**Memorandum Decision & Order – page 11**

such a program.  *Id.* at 206.  Regardless, Penrod was kept on the shift for 14 months, far longer than the alleged cross-training program was supposed to last.  *Id.* at p. 204. Grimm resisted moving Penrod off the graveyard shift.  *Id.* at p. 208.

Each of the other plaintiffs have similar allegations that when they complained about safety and security issues – or improprieties such as backdating court documents or ignoring employees' written complaints about safety issues – they were threatened or harassed in an effort to suppress their speech.  These allegations at least create issues of fact that the plaintiffs suffered an adverse employment action as a result of engaging in protected speech.

The last two factors to be considered in whether plaintiffs have a  First Amendment claim, as quoted above, are (1) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (2) whether the state would have taken the adverse employment action even absent the protected speech.  These are intensely factual matters and the briefing of the defendants does not identify uncontroverted facts that would allow summary judgment on these issues.

The defendants argue next that Grimm and Harrigfeld cannot be liable under § 1983 merely because they were supervisors, and can only be liable if there is evidence that they personally participated in the retaliation; defendants argue that there is no such evidence.  The defendants get the legal standard right, but ignore allegations – which the Court must credit at this stage of the proceedings – that Grimm and Harrigfeld did participate in the retaliation.

Under § 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability. *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012). "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* A supervisor "may be liable if the supervisor knew of the violations and failed to act to prevent them." *Id.* at 989 (holding that state official not entitled to summary judgment where he knew of problem but failed to act to prevent further harm).

Here, there is evidence, discussed above, that Grimm and Harrigfeld knew of the harassment and threats and yet took no action. Moreover, there is evidence they personally participated in the retaliation by drafting special "expectations" for Ledford and taking other action against those who signed the petition. There is sufficient evidence here – as there was in *Snow* – to create issues of fact and preclude summary judgment on whether Grimm and Harrigfeld personally participated in the retaliation for purposes of § 1983.

The defendants argue next that Grimm and Harrigfeld are entitled to qualified immunity because the law concerning employees' First Amendment rights was not clearly established at the time Grimm and Harrigfeld were allegedly impinging on those rights. Specifically, defendants argue that the *Dahlia* case that broadened employees' speech protections was not decided until 2013, and yet the conduct of Grimm and Harrigfeld challenged here occurred between 2010 and 2012. The law at that time was set forth in *Huppert v. City of Pittsburg,* 574 F.3d

**Memorandum Decision & Order – page 13**

696 (9th Cir. 2009).  It held that a police officer whose duties included investigating corruption could be disciplined for the report he filed (within the chain of command) concerning that investigation.  In other words, the officer was speaking as a public employee and thus his speech was not protected.  Defendants argue that they were entitled to rely on *Huppert* in disciplining the plaintiffs and should not be held to the higher standard set out in *Dahlia* decided in 2013.

The Court disagrees for two main reasons.  First, plaintiff Ledford complained to the Governor's office and a State Senator.  That speech was clearly protected by the law in existence at that time.  *See Freitag v. Ayers,* 468 F.3d 528, 545-46 (9th Cir.2006) (holding that the correctional officer's communications with a state senator and the inspector general were protected speech).  Second, the police officer in *Huppert* investigated corruption – in his own department among other places – as part of his official duties.  None of the plaintiffs here had a duty to investigate or evaluate the practices of Grimm and Harrigfeld.  *See Cloud Affidavit (Dkt No. 34) (and attached job descriptions).*  Thus, Grimm and Harrigfeld could not have reasonably read *Huppert* as immunizing any harassment of the plaintiffs.  The Court therefore rejects the defendants qualified immunity argument.

**Idaho Constitutional Claim**

In Count Two, plaintiffs allege that defendants violated their rights under the Idaho Constitution, and they seek monetary damages along with declaratory and injunctive relief.  The defendants point out that this Court has previously dismissed claims for monetary damages under the Idaho Constitution, ruling consistently with

Idaho's trial courts that the lack of a State equivalent to § 1983 bars such damages. *Hancock v. Idaho Falls,* 2006 WL 1207629 (D.Id. May 2, 2006). The Idaho appellate courts have not issued any rulings resolving the issue, and the Court can find no reason to reconsider its earlier analysis. Accordingly, the Court will grant that portion of defendants' motion that seeks to dismiss the claims for monetary damages under Count Two.

**Idaho Whistleblower's Act**

In Count Three of their Second Amended Complaint, plaintiffs allege that defendants violated the Idaho Protection of Public Employees Act (IPPE) by retaliating against them for complaining about waste and violations of the law. This Act is known as the "Idaho Whistleblower Act." It was intended to "protect the integrity of government by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." *Van v. Portneuf Medical Center,* 212 P.3d 982, 987 (Id.Sup.Ct. 2009).

Defendants allege that plaintiffs have failed to show that any adverse employment action was taken against them, as required for an IPPE claim. But the case cited in support of this argument by defendants, *Hatheway v. Board of Regents*, 310 P.3d 315 (Id.Sup.Ct. 2013), uses Ninth Circuit and other federal cases to guide their decision. Thus, *Coszalter* would apply and provide the same answer here that it provided above – the plaintiffs have at least raised genuine issues of fact on the adverse employment action question.

**Memorandum Decision & Order – page 15**

Defendants respond that the definition of "adverse action" in Idaho Code § 6-2103 does not fit with plaintiffs' allegations. The Court disagrees. As discussed above, plaintiffs allege that they were threatened with firing if they resisted certain management practices, and the statute says "adverse action" means "to threaten . . . an employee in any manner that affects the employee's employment . . . ." Thus, the allegations fit the statutory definition.

Defendants argue that plaintiffs have failed to establish that Grimm and Harrigfeld knew of their complaints. But the discussion above demonstrates that plaintiffs have at least raised genuine issues of fact regarding the knowledge of Grimm and Harrigfeld.

Defendants argue that plaintiffs have not alleged that they were complaining – as the Act requires – about waste or the violation of a "law, rule, or regulation adopted under the laws of this State, a political subdivision of this State or the United States." I.C. § 6-2104(1)(a). The plaintiffs' speech concerned violation of the rights of juvenile inmates, and those rights are protected by laws such as the Civil Rights of Institutionalized Persons Act, the Prison Rape Elimination Act, and the Idaho Juvenile Corrections Act. At the very least, this creates a question of fact over whether the plaintiffs have satisfied § 6-2104(1)(a).

Finally, defendants argue that the claims of plaintiffs Ledford and Littlefield must be dismissed because the retaliation they describe occurred more than 180 days from the date this lawsuit was filed. The Act states that claims must be brought within 180 days "after the occurrence of the alleged violation . . . ." I.C. § 6-2105(1).

**Memorandum Decision & Order – page 16**

This lawsuit was filed on June 25, 2012.  Thus, under the limitations period of the Act, the only actionable retaliation is that which occurred on or after December 28, 2011. Both Ledford and Littlefield allege that the harassment and threats continued after December 28, 2011.  So those claims survive.  But Littlefield and Ledford also make many allegations concerning retaliation that occurred prior to December 28, 2011, and those allegations would appear to be irrelevant and inadmissible.  The briefing did not detail each retaliation claim that occurred prior to December 28, 2011, and so the Court cannot with any precision make a final decision striking specific allegations.  Prior to trial, however, this issue could be taken up in a motion in limine.

## FMLA & ADA Claims

In Count Five, plaintiff Ledford alleges that the defendants violated the Family Medical Leave Act (FMLA) and the Americans With Disabilities Act.  She argues that the defendants (1) improperly denied her request for intermittent leave (2) forced her to take more leave than was medically necessary; and (3) treated her in bad faith by keeping her "from being paid for three months, forc[ing] her to use all of her sick leave, and nearly crush[ing] her spirit."  *See Ledford Brief (Dkt. No. 53)* at p. 14.  Ledford appears to have used these same facts to allege claims under both the FMLA and the ADA.  The Court will review the facts contained in the record before resolving defendants' motion on this issue.

Ledford requested and was granted FMLA leave in July of 2011, for the anxiety and depression she was experiencing.  Later, she requested intermittent leave that would allow her to leave work whenever she experienced severe anxiety.  She explained that she

wanted intermittent leave to save her sick leave, which was running out.  If she was on continuous FMLA leave, it would largely be unpaid leave.

Her claim for intermittent leave was denied because she could not be allowed to leave when interacting with juvenile inmates.  On September 5, 2011, Ledford submitted a note from her physician stating that she was "unable to return to work in any capacity due to external stress that can/may occur in the workplace surroundings."  *See Exhibit 14 (Dkt. No. 34-2)*.  The form the physician filled out asked him to estimate the number of hours she could work on a part-time or reduced work schedule, and he drew a zero with a line through it, indicating that she could not work a part-time or reduced work schedule. *Id.*  Based on this physician's note, Ledford remained on continuous FMLA leave.  When she was medically released to work, she was assigned to the dayshift with the same pay and benefits she was receiving prior to taking her FMLA leave.

Ledford's FMLA and ADA claims focus on the denial of her request for intermittent leave as being a failure to accommodate her medical disability.  *See Ledford Brief (Dkt. No. 53)* at p. 14.  But her own physician stated that she could not return to work "in any capacity."  And when asked to estimate the number of hours Ledford could work on a part-time or reduced work schedule, the physician estimated zero hours. Moreover, Ledford fails to point the Court to any evidence in the record that rebuts the defendants' reason for denying her intermittent leave – that she could not just abandon her work with juvenile inmates whenever she felt stressed.  Ledford's job description requires that she "[m]aintain consistent and reliable attendance" because she would be working with "violent and aggressive juvenile offenders."  *See Exhibit 1 (Dkt. No. 34-1)*.

This record aligns this case with *Samper v. Providence St. Vincent Medical Center,* 675 F.3d 1233 (9th Cir. 2012).  There, a nurse with fibromyalgia requested an accommodation that would allow her more unplanned absences than allowed by hospital policy.  When her request was denied, she filed an ADA claim against the hospital alleging that it failed to accommodate her request.  The district court granted summary judgment for the hospital and the Circuit affirmed.  The Circuit found that the nurse's job description required regular attendance, and that the nurse "offers nothing to rebut [the hospital's] undisputed evidence . . . ."  *Id.* at 1239.

The same result is warranted in this case.  Ledford has failed to raise any genuine issues of material fact on her claims under the FMLA and the ADA.  Moreover, Ledford's complaint that she was not paid during her FMLA leave is not For that reason, Count Five must be dismissed.

## ADEA Claim

In Count Six, plaintiff McKinney alleges that she was the victim of a hostile work environment due to her age.  The defendant argues persuasively that the record contains no support for McKinney's claim that she was subjected to the "severe or pervasive" hostility that is required for an ADEA claim.  *Freitag,* 468 F.3d at 539.  McKinney does not cite any evidence in the record to rebut defendants' argument but merely argues that her claim should be remanded to the EEOC rather than be dismissed.

McKinney cites no authority for her remand suggestion, and the Court's own search could find none.  The Court agrees with the defendants that the record contains no support for this claim, and it will be dismissed.

**Memorandum Decision & Order – page 19**

**Military Veteran Claim**

In Count Seven, plaintiff Penrod alleges that defendants violated the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. §§ 4301–4333.  However, individuals cannot bring an action under the USERRA against a state entity or state officials in federal court but must instead bring their action in state court.  *See Townsend v. University of Alaska,* 543 F.3d 478, 483-84 (9th Cir. 2008).  Thus, Count Seven must be dismissed.[2]

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment (docket no. 33) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks to dismiss Counts Four, Five, Six, and Seven.  It is further granted to the extent it seeks to (1) dismiss all monetary damage claims against the state agency defendant and the individual defendants sued in their official capacity; and (2) dismiss the claim for monetary damages against the agency defendant and individual defendants – whether sued in their official capacity or individual capacity – contained in Count Two for violation of the Idaho Constitution.  It is denied in all other respects.

---

[2] The plaintiffs seek to strike the entire motion for summary judgment on the ground that the names of juveniles were not redacted in some of the defendants' filings. The Court has now ordered those filings to be sealed and directed counsel to file redacted versions. The Court will deny the motion to strike.

IT IS FURTHER ORDERED, that the remaining claims in this case are as follows:  (1) compensatory damage claims under Count One (First Amendment claim) and Count Three (Idaho Whistleblower Act) against the individual defendants in their individual capacity, and (2) claims for declaratory and prospective injunctive relief under Counts One through Three against all defendants.

IT IS FURTHER ORDERED, that the motion to strike (docket no. 57) is DENIED.

DATED: March 6, 2014

B. Lynn Winmill
Chief Judge
United States District Court